**Affirmed and Memorandum Opinion filed November 21, 2023.**



In The

# Fourteenth Court of Appeals

NO. 14-23-00387-CV
NO. 14-23-00399-CV

## IN THE INTEREST OF E.J., B.E.J., AND B.E.J., CHILDREN

**On Appeal from the 257th District Court
Harris County, Texas
Trial Court Cause Nos. 2020-32839, 2020-24836**

## M E M O R A N D U M   O P I N I O N

The trial court terminated a mother's parental rights to her daughters E.J.,[1] B.E.J., and B.E.J.[2] on the predicate ground of endangerment.  *See* Tex. Fam. Code § 161.001(b)(1)(D).  The court also found that termination was in the children's best interest and appointed the Department of Family and Protective Services (the "Department") as sole managing conservator.  On appeal, Mother contends that the

---

[1] Mother appeals the termination of her parental rights to E.J. in no. 14-23-00387-CV.

[2] Mother appeals the termination of her parental rights to twins B.E.J. and B.E.J. in no. 14-23-00399-CV.

trial court lacked jurisdiction to terminate her parental rights because the trial commenced after the statutorily mandated dismissal date. She also challenges the legal and factual sufficiency of the evidence to support the predicate ground. Because we conclude that trial commenced before the statutorily mandated dismissal date and that legally and factually sufficient evidence supports the trial court's finding that Mother endangered these three children, we affirm the judgments.

## Background

These appeals involve the termination of Mother's parental rights to the youngest three of her eight children, E.J. ("Emma"), B.E.J. ("Bella"), and B.E.J. ("Brianna"). Emma was born in December 2018, and twins Bella and Brianna were born in February 2020.

## A. Events precipitating removal

The pre-trial removal affidavits contained in our record reflect Mother's history with the Department:[3]

| Date | Type of Referral | Disposition |
|---|---|---|
| 9/18/2012 | Sexual Abuse of then 2-year-old K.B. | Ruled Out |
| 3/28/2014 | Physical Abuse of then 1-year-old G.J. by his father | Ruled Out, but case referred to Family-Based Safety Services ("FBSS")[4] |
| 9/18/2017 | Neglectful Supervision of then 7-year-old K.B., 4-year-old G.J., and 3-year-old R.B.; | Ruled Out |

[3] Since 2012, the Department has been involved with Mother in connection with all eight of her children: K.B., G.J., R.J., M.R., M.R., Emma, Bella, and Brianna.

[4] FBSS are "designed to maintain children safely in their homes—or make it possible for children to return home—by strengthening the ability of families to protect their children and reducing threats to their safety." *See* Fam.-Based Safety Servs., Tex. Dep't of Fam. & Protective Servs., *available at* https://www.dfps.texas.gov/Child_Protection/Family_Support/FBSS.asp.

| Date | Type of Referral | Disposition |
|---|---|---|
| | children alleged to be left home alone by Mother | |
| 9/12/2018 | Physical Abuse of G.J. by family friend and Neglectful Supervision of G.J. by Mother | Unable to Determine |
| 10/17/2018 | Physical Abuse of then 5-year-old G.J. by Mother and family friend | Reason to Believe – continue monitoring and FBSS |
| 11/18/2019 | Neglectful Supervision of then 8-year-old K.B., 6-year-old R.J., 5-year-old G.J., and 4-month-old twins M.R. and M.R. by Mother; Physical Abuse of G.J. by Mother and family friend | Reason to Believe – continue FBSS; G.J. removed to a Parental Child Safety Placement ("PCSP")[5] |
| 1/10/2019 | Neglectful Supervision of then 2-week-old Emma by Mother | Unable to Determine – continue FBSS |
| 5/4/2019 | Neglectful Supervision of then 9-year-old K.B., 6-year-old G.J., 4-year-old R.J., 1-year-old M.R., 1-year-old M.R., and 4-month-old Emma by Mother | Unable to Determine – continue monitoring and FBSS |
| 8/29/2019 | Physical Abuse of then 6-year-old G.J. by Mother and family friend | Ruled Out |
| 11/14/2019 | Physical Abuse of G.J. by Mother | Unable to Determine |
| 4/30/2020 | Neglectful Supervision of G.J., Emma, Bella, and Brianna by Mother | Reason to Believe – G.J., Emma, Bella, and Brianna removed from Mother's care and placed in Department's Temporary Managing Conservatorship ("TMC") |

---

[5] A PCSP provides for a child to live elsewhere temporarily, usually with relatives or close family friends, until it is safe for them to return to their parent. *See id.*

| Date | Type of Referral | Disposition |
|------|------------------|-------------|
| 2/6/2021 | Neglectful Supervision of Bella | Disposition Unclear |
| 4/7/2021 | Neglectful Supervision of all children | Reason to Believe – all children removed from Mother's care and placed in Department's TMC |

Details concerning the April 2020 and April 2021 referrals are particularly relevant to resolution of this appeal. According to the affidavit filed by caseworker Michelle Menjivar, in April 2020 the Department received a referral alleging neglectful supervision of G.J., Emma, Bella, and Brianna. It was reported that the children were unkempt due to a lack of care and that the girls' parents were using drugs and engaged in domestic violence. Menjivar investigated and, on May 14, 2020, met with Mother, G.J., Emma, Bella, and Brianna at the home of Mother's mother. When Menjivar explained that the Department wanted to implement a PCSP, Mother fled in her car with the children. According to Menjivar, Mother did not secure the children in the vehicle, drove erratically, exceeded the speed limit, and ignored traffic signals. On May 28, Menjivar attempted contact with Mother at an address in Tomball, Texas. G.J. answered the door and explained he was home alone with his three-month-old twin sisters Bella and Brianna and his one-year-old sister Emma while Mother was having her hair done. G.J., who was seven years old at the time, told Menjivar that it was "normal" for him to be left responsible for his siblings' care. Menjivar described the children as unkempt and hungry. G.J. had no way to contact Mother because he did not know how to use the cell phone she left with him. After law enforcement was contacted, officers communicated with Mother, who stated she was at a nearby grocery store. Mother did not arrive home for another hour, however, and she was accompanied by a friend who stated that Mother had been at a hair appointment since 9 a.m. that morning. Mother was

4

arrested on four counts of child abandonment with intent to return, taken to jail, and the four children—G.J., Emma, Bella, and Brianna—were placed with a putative relative.[6] Within one month, the Department placed Emma, Bella, and Brianna in a foster home.

The other four children were not home when this incident occurred and were not removed from Mother's care. It appears from our record that they were in the care of kin or fictive kin at the time of this incident. Regarding the removed children, Mother signed a family services plan, which she successfully completed. The court ordered G.J., Emma, Bella, and Brianna returned to Mother in December 2020. The other children also returned home, and by Christmas 2020, all eight children were living with Mother, with the Department monitoring the family.

The next key event occurred in April 2021. The Department received another referral alleging neglectful supervision, this time of all eight children. Caseworker Ceraira Simmons prepared the removal affidavit describing the investigation. Mother left the five older children home alone when she went to pick up Emma, Bella, and Brianna from daycare. One of the three-year-old twins, M.R., was seen outside unsupervised and climbing on cars. A neighbor called law enforcement. When officers arrived, they found M.R. three houses away from his home, jumping on a truck. K.B., who was ten years old at the time, told the officers that Mother left to pick up the other children from daycare. When Mother returned, she told the officers that she had been gone only since 5:30 p.m., but the officers knew this was not true because they were present at Mother's house at 5:30 and she was not there. Additionally, the neighbor reported that she had seen M.R. wandering alone in the street multiple times and had almost hit him with her car. The Department concluded

---

[6] Trial testimony by caseworker Ceraira Simmons reflects that the purported relative was actually a friend of Emma's, Bella's, and Brianna's father.

that there was reason to believe neglectful supervision had occurred, which was particularly concerning to the Department because the circumstances were similar to those that had brought G.J., Emma, Bella, and Brianna into care initially and for which Mother was currently facing criminal charges for abandonment. The Department removed all eight children from Mother's care. Emma, Bella, and Brianna were placed with the same foster family as had previously cared for them. The other five children were placed in kin or fictive kin settings.

## B.     Trial proceedings

The Department sought to terminate Mother's rights as to all eight children, but the cases did not proceed at the same time. On November 30, 2021, the court called to trial the cases involving G.J., Emma, Bella, and Brianna. The court swore in witnesses, and the children's counsel invoked the Rule. The Department notified the court that Emma's unknown father was not represented by counsel.[7] Because of this issue, the trial court extended the dismissal deadline for Emma's case until February 1, 2022, and reset her case for trial on January 18, 2022 (the same day the companion cases involving K.B., R.J., M.R., and M.R. were set for a permanency hearing). The Department's caseworker, Simmons, then testified regarding Bella's and Brianna's status and needs, their current placement, and the Department's primary goal of "unrelated adoption" for both them and Emma.[8] She briefly explained the April 2020 referral and subsequent removal of G.J., Emma, Bella, and Brianna. Simmons testified that the children were returned to Mother's home on a "monitored" basis in December 2020 because Mother had completed her services and complied with the Department's plans. Simmons further testified that all eight

---

[7] Paternity testing later confirmed that Emma shared the same father as Bella and Brianna.

[8] Despite Emma's case being re-set to January 2022, Simmons included some very brief testimony about Emma during her time on the stand. The bulk of her testimony, however, concerned G.J., Bella, and Brianna.

children were removed in April 2021 after the Department received a report that the five older children had been left home alone and that one of the four-year-old twins was left unsupervised outside and was almost hit by a car. Simmons testified about Mother's extensive history with the Department, including eleven investigations. Simmons stated that Mother was given a new plan after the April 2021 removal. Mother identified several relatives with whom the children might be placed, but the Department rejected them for various reasons. According to Simmons, the Department sought termination of Mother's parental rights because of her pattern of leaving the children alone or unsupervised in the home, the fact that she does not have a stable support system, her inability to meet their mental and emotional needs, and her history with the Department. Mother's counsel cross-examined Simmons and offered several exhibits into evidence, including certificates of Mother's completion of various services. Counsel elicited testimony that Mother complied with the Department's plans, visited the children, and addressed the Department's concerns regarding her visits with the children. The trial court then recessed proceedings.

On January 18, 2022, the court resumed trial of the cases involving G.J., Bella, and Brianna. The court also called Emma's case for trial. The Department recalled Simmons to the stand, and she testified that the Department's goal for Emma is unrelated adoption, with a concurrent goal of family reunification. The trial court recessed those cases and conducted a permanency hearing on the cases involving K.B., R.J., M.R., and M.R.

On February 15, 2023, trial resumed for Emma's, Bella's, and Brianna's cases, along with the cases involving the other five children. According to the trial court, some exhibits had been admitted previously by stipulation. Once again, Simmons returned to the stand. She testified that Bella and Brianna were three years

7

old, and Emma was four. The Department's primary goal for all eight children was adoption. Emma, Bella, and Brianna were placed in a potentially adoptive foster home. Simmons reiterated the facts leading up to the removal of the children, including discussion of the April 2020 and April 2021 referrals. She also discussed Mother's history with the Department, including several neglectful supervision allegations. Simmons explained that Mother "worked services" for three or four cases with the Department.

Simmons testified that Emma, Bella, and Brianna share the same father ("Father"). He was incarcerated for assault while the Department acted as temporary managing conservator of his three daughters, but he was released during the pendency of the case. According to Simmons, Father never participated in a family services plan, although he told Simmons he would like the children either returned to him or Mother. In January 2023—the month before the trial proceedings relating to his daughters recommenced—Father was charged with assault of a family member for an incident involving Mother. At the time of the assault, Mother was pregnant with Father's child. Simmons testified that this raised particular concerns with the Department because Mother continued to "put[] herself in a place to be potentially harmed, and that if she is not protective of herself, that she cannot be protective of the children." The Department also was concerned that Mother seemingly had not learned anything from the domestic violence programs she attended at the Department's behest.

Simmons also described criminal charges against Mother. According to Simmons, Mother had been charged with assault before Emma, Bella, and Brianna came into the Department's care. As mentioned above, Mother was charged with child endangerment and abandonment with intent to return in relation to the April 2020 referral. The endangerment/abandonment charges were dismissed, but Mother

8

was placed on community supervision for the assault charge and ordered to complete a batterer's intervention program. Simmons testified that, although Mother has suitable living arrangements, is employed, and has completed various Department services, she has failed to change her behavior toward her children: "[S]he's received services once before. The children were returned to her care, and the same act was repeated. So we don't know that she's capable — the Department doesn't feel she is capable of learning from services."

Simmons described the April 2020 referral in greater detail. She explained that, after receiving the referral, the Department made an unannounced "pop-up" visit and discovered seven-year-old G.J. home alone with Emma, Bella, and Brianna. G.J. refused to let the Department caseworker in until law enforcement arrived. Once officers and the caseworker entered the house, G.J. was seen attempting to cook food for himself, one-year-old Emma, and four-month-old twins Bella and Brianna. According to Simmons, Mother did not return home for a "significant amount of time." Mother was charged with child endangerment. She participated in various Department services for the next few months while the other four children lived with various family members or fictive kin. According to Simmons, Emma, Bella, and Brianna were placed with Father's friend. This arrangement turned out to be temporary because, after Father assaulted her, the friend was no longer willing to take care of the children. They were then placed with their current foster family.

Simmons testified that, while the children were in foster care following the April 2020 referral, the Department worked with Mother and a back-up caregiver. The plan was that, if Mother could not supervise the children temporarily for any reason, the back-up caregiver would be available. Mother knew the children were not to be left alone. Yet, in April 2021, only about four months after G.J., Emma,

9

Bella, and Brianna were returned to her care, she left the older five children home alone.

Simmons explained that throughout Mother's history with the Department, the Department had concerns about her children's fathers. One of the fathers allegedly appeared at a doctor's appointment under the influence. Also, there were allegations of physical abuse of the children, including a specific allegation that Father physically abused G.J.

Simmons also expressed concerns about Mother's refusal to leave abusive relationships. Mother disclosed to Simmons that her relationship with Father had been violent. When G.J., Emma, Bella, and Brianna were first removed, Father was in jail for assault, but Mother continued her relationship with him, including while she received Department services. After she completed her services, Mother continued her relationship with Father once he was released from jail despite the fact that he had assaulted her in the past and assaulted her again after his release. According to Simmons, "the Department feels that they have offered mom services. Potentially, there aren't any other additional services that we can offer that could change the current circumstances."

Mother's testimony generally echoed much of the Department's other proof regarding her continued involvement in abusive relationships, including the domestic abuse that occurred during her four-year "off and on" relationship with Father. She acknowledged that Father assaulted her more than once before the children were removed, that law enforcement was involved in at least two instances, and that she was sometimes scared for her safety during their relationship.[9] She also

---

[9] Additionally, Mother described an incident of domestic violence involving G.J.'s father when K.B. and G.J. were younger (before the births of Emma, Bella, and Brianna). Mother stated she called police, but no charges were filed.

admitted that, during the last few years, Father was in and out of prison for assaulting other people.[10] Nonetheless, when Father was released from prison in October 2022, she pursued reconciliation with him. She became pregnant again shortly thereafter. According to Mother, he became more controlling, showing "attitude and aggression." He assaulted her while she was pregnant in January 2023, after which she lost the baby.

Mother acknowledged that the April 2020 and April 2021 removals resulted from her decision to leave the children home alone. As to the 2020 incident, Mother testified that the children were asleep, so she "felt like [she] could run to the store, which I shouldn't have."[11] Regarding the 2021 incident, Mother left the five older children home alone while she went to pick up Emma, Bella, and Brianna because she did not have a working vehicle large enough to accommodate all eight children. She agreed that, at the time, she "felt like [K.B.] was responsible enough to handle the other kids," but she now knows "that was really not the situation."

Betsi Longoria, the children's guardian ad litem, testified that Mother's parental rights should be terminated because she was unable "to protect her children and to keep them safe from harm, emotional and physical harm." According to Longoria, Mother failed to show she could be protective of her children, despite ample opportunity over the preceding eight years including multiple interventions by the Department and the provision of FBSS and other services. Longoria stated that Mother has displayed a pattern of ignoring the Department's concerns about physical abuse and domestic violence. Longoria did not trust Mother's statement

---

[10] Mother acknowledged that, in 2019, she physically fought Father's former girlfriend while Emma, a baby at the time, was nearby in Mother's car.

[11] Mother claimed she was only gone for about thirty minutes, but police officers were at the home for over an hour before she returned. As noted above, a friend who was with her stated that Mother had been at a hair appointment since 9 a.m. that morning.

11

that she no longer has contact with Father because "she's gotten back together with him in spite of the previous assaults."

During Mother's case in chief, she testified that the endangerment/abandonment criminal charges against her had been dismissed. She acknowledged that she left the children alone again after she was charged, but insisted that she had found the right resources, including schooling and daycare, near her home and that it would not happen again: "[U]nder no circumstances will I leave them alone. And if I can't take them with me, I can't go." She testified that she has built a support system around her by meeting local parents and discovering programs that would help her manage her eight children. She also further discussed her five-year relationship with Father, acknowledging the incidents of domestic violence described above. She insisted, however, that she had learned through her domestic violence programs that their relationship was unhealthy. She stated that she has had no further contact with Father since the last assault while she was pregnant.

The trial court signed final orders terminating Mother's parental rights to Emma, Bella, and Brianna under Family Code section 161.001(b)(1)(D). The court further found that termination of Mother's parental rights was in the children's best interest.

**Analysis**

**A. Jurisdiction**

In her first two issues, Mother challenges the final orders on the ground that trial commenced after the statutorily mandated dismissal date.

In termination-of-parental-rights cases brought by the Department after September 1, 2017, a trial court automatically loses jurisdiction over a case if the court does not commence a trial on the merits or grant an extension by the dismissal

deadline provided by section 263.401(a). *See* Tex. Fam. Code § 263.401(a); *In re Z.S.*, 631 S.W.3d 313, 316-17 (Tex. App.—Houston [14th Dist.] 2020, no pet). In pertinent part, section 263.401 provides:

> (a) Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship . . . is terminated and the suit is automatically dismissed without a court order. . . .

> (b) Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child. If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a). . . .

Tex. Fam. Code § 263.401(a), (b). If the court grants an extension under subsection (b) but does not commence the trial on the merits before the dismissal date, the court's jurisdiction over the suit is terminated and the suit is automatically dismissed without a court order. *Id*. § 263.401(c).

The trial court signed a temporary order appointing the Department temporary managing conservator of Bella and Brianna on June 11, 2020. The dismissal date for Bella's and Brianna's case was June 14, 2021, the first Monday after the first anniversary of June 11, 2020. *See* Tex. Fam. Code § 263.401(a). The trial court signed a temporary order appointing the Department temporary managing conservator of Emma on June 15, 2020, so the dismissal date for Emma's case was originally June 21, 2021. *See id*.

The dismissal date for these cases was extended to December 6, 2021 pursuant to Emergency Orders related to the Covid-19 pandemic. The dismissal date in Emma's case was further extended to February 1, 2022, again pursuant to the Emergency Orders. Thus, if trial commenced in Bella and Brianna's case on November 30, 2021, and if trial commenced in Emma's case on January 18, 2022, then the trial court would have retained jurisdiction as to all three children.

Mother asserts that the November 30, 2021 and January 18, 2022 proceedings were not "real trials" but were "sham" settings to "get around the dismissal dates." According to Mother, the court's jurisdiction terminated well before the "real" trials commenced in mid-February 2023.

Several courts, including this court, have considered when trials "commence" under section 263.401. *See, e.g.*, *In re Z.S.*, 631 S.W.3d at 316-19 (citing cases). In *In re Z.S.*, a case from this court, the parties signed a Rule 11 agreement to reset trial to April 15, 2019, which was five days before the automatic dismissal date, and agreed to "start and stop the trial" on that date. *Id.* at 315. On April 15, the parties appeared for trial and made their announcement, and mother's counsel confirmed that the case would begin that morning but then be recessed to a future date. *Id.* The Department called its investigator to the stand; she briefly testified regarding her experience and explained that she had received allegations of neglect of the children. *Id.* The trial court then recessed the trial. *Id.* On that record, we concluded that trial "commenced" on April 15, largely because the Department's investigator was sworn and briefly testified. *See id.* at 318.

In contrast, we have also held that trial did not "commence" when no preliminary matters were addressed, the parties did not announce ready, no opening statements were made, no exhibits were admitted, and the only witness to testify was called by the trial court, only stated his name, and did not explain his connection to

14

the proceedings. *See In re J.L.J.*, 645 S.W.3d 294, 295-96 (Tex. App.—Houston [14th Dist.] 2022, pet. denied). The factors we considered in determining whether trial commenced include (1) whether the putative commencement date is recited as a trial date in the final order, and (2) whether in the time between calling the case and recessing on the putative commencement date, (a) preliminary matters were addressed, (b) the parties announced "ready," (c) opening statements were made, (d) witnesses were sworn, (e) a party called a witness to testify, and (f) exhibits were admitted. *Id.* Our court has also made clear that the date when trial concluded is not a controlling factor in this analysis. *In re Z.S.*, 631 S.W.3d at 319 (explaining the focus of the analysis is the commencement of trial, not the duration or conclusion of trial).

On November 30, 2021, the trial court called Bella's and Brianna's case to trial. The parties announced ready and numerous witnesses were sworn. The court admitted several of Mother's trial exhibits. Mother's counsel invoked the Rule. The Department's caseworker, Simmons, testified about Bella and Brianna, their status, and their removal from Mother's care. Simmons also testified about Mother's history with the Department. Mother's counsel cross-examined Simmons about Mother's performance of services and compliance with the Department's parenting plan. Then, the trial court recessed the trial and set it to resume on January 18, 2022.

On January 18, the trial court announced that it (1) was resuming trial on Bella's and Brianna's case and (2) called Emma's case for trial. Attorneys made announcements, witnesses were sworn, and Simmons took the stand again. She briefly testified that the Department's goal for Emma was unrelated adoption, with a concurrent goal of family reunification. The trial court then recessed the case and set it to resume, along with Bella and Brianna's case, on a later date.

These actions show, and we thus conclude, that trial on the merits commenced on November 30, 2021 in Bella's and Brianna's case and on January 18, 2022 in Emma's case. *See id.* at 318; *see also In re J.M.F.*, No. 14-22-00628-CV, 2023 WL 2182435, at *2-4 (Tex. App.—Houston [14th Dist.] Feb. 23, 2023, no pet.) (mem. op.) (concluding that trial commenced before dismissal date where a witness was sworn and gave "substantive testimony"); *In re H.B.C.*, No. 05-19-00907-CV, 2020 WL 400162, at *13-14 (Tex. App.—Dallas Jan. 23, 2020, no pet.) (mem. op.) (holding that trial on the merits commenced when case was called for trial, counsel announced ready, court considered various pretrial matters raised by counsel, and a witness was sworn and briefly testified); *In re R.J.*, 579 S.W.3d 97, 109 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (trial on merits commenced when witnesses were sworn, counsel announced ready, pretrial matters were discussed, and the Department called a single witness who briefly testified before trial was recessed); *In re R.F.*, No. 04-17-00582-CV, 2018 WL 1308542, at *1 (Tex. App.—San Antonio Mar. 14, 2018, no pet.) (mem. op.) (holding that trial commenced even though father announced not ready and filed a motion for continuance because trial court denied the motion and the Department called its first witness who briefly testified before trial was recessed). November 30, 2021 and January 18, 2022 are within the extended deadline periods permitted by statute as extended by the supreme court's Covid-19 Emergency Orders.

Mother suggests that permitting such "stop and start" proceedings allows a termination case covered by section 263.401 to linger contrary to legislative intent. This position is not without support. *See In re J.D.G.*, 570 S.W.3d 839, 857-60 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Brown, J., concurring). Some courts, including this one, have determined that "commencing" the trial for section 263.401 purposes means more than merely calling the case and immediately recessing. *See,*

16

*e.g.*, *In re J.L.J.*, 645 S.W.3d at 295-96 (holding that trial did not timely commence; "No preliminary matters were addressed; the parties did not announce ready; no opening statements were made; and no exhibits were admitted. Moreover, no party called a witness to testify; the only witness to be sworn in and testify was called by the trial court, and the witness was asked only his name. His connection to the case was left unexplained."); *In re D.S.*, 455 S.W.3d 750, 752-53 (Tex. App.—Amarillo 2015, no pet.) (explaining that section 263.401 "requires more than a putative call of the case and an immediate recess"). The circumstances in today's case are distinguishable however because, on both November 30, 2021 and January 18, 2022, the parties made announcements, witnesses were sworn, and the Department called caseworker Simmons, who provided substantive testimony regarding Emma, Bella, and Brianna.

We overrule Mother's first and second issues.

## B. Statutory Ground for Termination

In her third and fourth issues, Mother challenges the legal and factual sufficiency of the evidence to support the court's endangerment finding under subsection 161.001(b)(1)(D).

### 1. Standards of review

In a proceeding to terminate the parent-child relationship under Family Code section 161.001, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). *See* Tex. Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re of J.F.-G.*, 627

S.W.3d 304, 310 (Tex. 2021); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *See In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.-G.*, 627 S.W.3d at 310; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the challenged finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that the finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of the finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *See id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be

18

mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345 (internal quotation omitted). We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

2.     Applicable law

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best interest finding, that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Endangerment under subsection (D) focuses on evidence related to the child's environment. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.). A child is endangered when the environment creates a potential for danger of which the parent is aware but consciously disregards. *See In re M.R.J.M.*, 280 S.W.3d 494,

502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the children's home can create an environment that endangers the physical and emotional well-being of children as required for termination under subsection (D). *See In re M.R.J.M.*, 280 S.W.3d at 502. In scrutinizing the endangerment findings, we focus not only on evidence of endangerment but also on evidence showing the parent's awareness of the endangering environment. *In re J.E.M.M.*, 532 S.W.3d 874, 880-81 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the Department does not need to establish that a parent intended to endanger the children to support termination based on endangerment. *In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *12 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.).

The relevant time frame for establishing that a parent knowingly placed, or allowed the children to remain, in conditions or surroundings that endangered their physical or emotional well-being is prior to the children's removal. *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A fact finder may infer from a parent's past conduct endangering the well-being of the children that similar conduct will recur in the future. *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.). Notably, a single act or omission may support termination under subsection (D). *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

3.      Application

There is no dispute that Mother twice left several of her very young children at home alone with no supervision for substantial time periods. The second instance occurred after four of the children had been removed from Mother's care, placed under the Department's conservatorship, and Mother had participated in and

successfully completed a family service plan designed to equip Mother with the necessary tools to regain possession of her children. Yet only four months after her children were returned to her, she again chose to leave five of her eight young children home alone and unsupervised.

A parent's failure to properly supervise her young children endangers the children's physical or emotional well-being. *In re N.L.S.*, No. 01-23-00297-CV, 2023 WL 6627526, at *21-22 (Tex. App.—Houston [1st Dist.] Oct. 12, 2023, no pet. h.) (mem. op.); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *10-11 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.); *In re J.H.*, No. 07-21-00059-CV, 2021 WL 2693284, at *3 n.4 (Tex. App.—Amarillo June 30, 2021, pet. denied) (mem. op.). Moreover, a parent creates an endangering environment that may support termination of parental rights when she leaves a young child alone in potentially dangerous settings, such as leaving the child home alone or with other young children without competent adult supervision. *See In re M.C.*, 917 S.W.2d 268, 269-70 (Tex. 1996) (per curiam) (holding that mother who left her young children alone in potentially dangerous situations endangered the children's physical well-being); *In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *14 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (mother went shopping and left one-year-old at home alone); *In re A.D.M.*, No. 01-16-00550-CV, 2016 WL 7368075, at *8 (Tex. App.—Houston [1st Dist.] Dec. 20, 2016, pet. denied) (mem. op.); *In re M.D.V.*, No. 14-04-00463-CV, 2005 WL 2787006, at *5-6 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op.) (mother saw two-year-old child open door to go outside but did not act to immediately retrieve child, who was picked up by strangers near a busy street; caseworker saw mother on phone in the dining room when child under two years of age was in another room in a bathtub full of water; children opened the door and left the house when mother was

21

not properly supervising them). Evidence that a parent has failed to supervise her young children supports a trial court's finding that the parent has "knowingly placed or knowingly allowed [her] child[ren] to remain in conditions or surroundings which endanger[ed] [their] physical or emotional well-being." *See* Tex. Fam. Code § 161.001(b)(1)(D); *see also In re I.F.*, No. 01-22-00375-CV, 2022 WL 16640627, at *5 (Tex. App.—Houston [1st Dist.] Nov. 3, 2022, no pet.) (mem. op.) (upholding termination under subsection (D) when, among other things, evidence showed parent left children unsupervised in hotel room). The trial court reasonably could have concluded that Mother's pattern of leaving her young children home alone without supervision contributed to an environment that endangered Emma's, Bella's, and Brianna's physical and emotional well-being.

Further, Mother acknowledged that domestic violence occurred in the home before the children were removed. She testified that, while the children were in her care, Father assaulted her on more than one occasion. She and Father fought frequently and that she was sometimes afraid of him. Violent conduct by one parent toward the other parent may produce an environment that endangers the physical or emotional well-being of a child. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The trial court reasonably could have believed that the children's exposure to domestic violence in their home environment endangered Emma's, Bella's, and Brianna's physical or emotional well-being.

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights was justified under Family Code section 161.001(b)(1)(D). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under subsection (D). Accordingly, we conclude

that legally and factually sufficient evidence supports the trial court's predicate finding.

We overrule Mother's third and fourth issues challenging the sufficiency of the evidence to support the trial court's predicate findings for termination.

## Conclusion

We have overruled Mother's jurisdictional issues and her issues challenging the trial court's predicate finding of endangerment. She has not challenged the trial court's best interest findings. Accordingly, we affirm the trial court's final orders terminating the parental rights of Mother to Emma, Bella, and Brianna and appointing the Department as sole managing conservator of these children.


/s/     Kevin Jewell
        Justice

Panel consists of Justices Jewell, Spain, and Wilson.